## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**CAVALIER DISTRIBUTING**
**COMPANY, INC.,**

        **Plaintiff,**                **Case No. 1:22-cv-121**
                                 **JUDGE DOUGLAS R. COLE**

    **v.**

**LIME VENTURES, INC.,** *et al.,*

    **Defendants.**

### OPINION AND ORDER

Plaintiff Cavalier Distributing Company, Inc. ("Cavalier"), an Ohio beer distributor, moves for a preliminary injunction (Doc. 5) against California beer importer Lime Ventures, Inc. ("Lime") and Belgian breweries Brouwerij 3 Fonteinen ("3F") and De La Senne (together "the Breweries"). Given the demanding standard required for such relief, the Court finds that Cavalier has failed to yet make the necessary showing, in particular as to its likelihood of success on the merits, and the Court thus **DENIES** the Motion (Doc. 5).

### BACKGROUND[1]

Many of the facts presented to date are straightforward and undisputed. The Breweries produce relatively small quantities of a sour beer referred to as a "lambic." Those quantities occupy a niche market. Before 2020, Cavalier continuously

---

[1] The basis for the facts summarized in this section consists of the testimony and exhibits entered into evidence at the April 25, 2022, hearing on Cavalier's Motion, unless otherwise noted.

distributed the Breweries' beers in Ohio for some years. (*See generally* Prelim. Inj. Hr'g Ex. 1). Despite distributing the beers, Cavalier had no direct relationship with the Breweries. Instead it acquired their products through Shelton Brothers, an importer. As best the Court can tell, Shelton Brothers, rather than the Breweries, selected Cavalier to distribute the products in Ohio, with the Breweries having no control over, or even input on, that selection.

That is not to say that the Breweries exercised no control over the beer brands. For example, the Breweries registered various trademarks with the U.S. Patent and Trademark Office. But the hearing testimony suggested that Shelton Brothers made the decisions about how and where the beers would be marketed in the United States and that Shelton Brothers had at least some input on the content of some of the label designs. Indeed, the beer industry in America apparently referred to the beers collectively (along with various other beers that Shelton Brothers distributed) as the "Shelton Brothers portfolio" or "Shelton Brands." And the hearing testimony likewise suggested that downstream distributors, including Cavalier, often marketed these products as the "Shelton Brothers brands" or "Shelton Brothers portfolio," rather than referring to the Breweries who actually manufactured the beer. For example, Cavalier's website did not mention 3 Fonteinen or De La Senne (the Breweries). Rather, the website stated that Cavalier carried the "Shelton Brothers" brand.

All was well until Shelton Brothers went bankrupt. Then, Shelton Brothers' relationship with the Breweries (and its access to their products) dried up. Sometime thereafter, Lime became the American importer of the Breweries' beers. From the

hearing testimony, it remains unclear exactly how that happened. It appears, though, that Lime did not acquire the rights through the bankruptcy proceedings, although Lime did apparently acquire some of the beer itself from Shelton Brothers as part of a bankruptcy transaction. Rather, Lime seems to have acquired the right to import directly from the Breweries themselves. And it appears this happened in part because one of the Lime co-owners previously worked at Shelton Brothers and developed a relationship with the Breweries. Regardless, after acquiring the rights to import the Breweries' products, Lime explored a potential relationship with Cavalier to distribute for Lime in Ohio. But negotiations broke down, and Lime declined to sell the Breweries' products to Cavalier. Instead, Lime began selling the beers at issue to Sixth City Distribution ("Sixth City"), one of Cavalier's competitors.

On March 4, 2022, Cavalier filed its Complaint (Doc. 1) asserting claims arising out of Ohio's beer franchise statute, Ohio Revised Code §§ 1333.82–87. Cavalier alleges that because it distributed the Breweries' products for more than ninety days, it enjoys a franchise relationship with the Breweries pursuant to § 1333.83. (*Id.* at #5). In turn, Cavalier alleges that Lime, acting as an agent of the Breweries, terminated the Breweries' franchise relationship with Cavalier. Cavalier claims this violated § 1333.85. (*Id.* at #6–9). Cavalier also alleges that Lime tortiously interfered with Cavalier's franchise relationship with the Breweries. (*Id.* at #12–13).

Cavalier moved for a temporary restraining order and preliminary injunction (Doc. 5) on March 22, 2022. At a status conference, the Court denied Cavalier's Motion (Doc. 5) insofar as it sought a temporary restraining order. (3/25/22 Minute Entry and

Notation Order). On April 8, 2022, both Lime and 3F responded in opposition (Docs. 15, 16) to Cavalier's Motion. Lime's primary argument is that Shelton Brothers' bankruptcy relieved Lime of any obligation to sell the Breweries' products to Cavalier. (*See* Doc. 16, #121–22). Separately, as to irreparable harm, Lime claims that Cavalier had not purchased any of the products at issue since 2019—more than two years before this action. (*Id*. at #123). For its part, 3F argues that this Court lacks personal jurisdiction over it. (Doc. 15, #108). De La Senne has not appeared in this action. Neither 3F nor De La Senne has been served with process.

Cavalier replied (Doc. 23) on April 15, 2022. It argues that it need not rely on any franchise relationship with Shelton Brothers because it has a relationship with the Breweries themselves based on its distribution of their products in Ohio for more than ninety days. (*Id*. at #181–82). Cavalier also argues that the statutory bankruptcy exception is irrelevant because it gives *Cavalier* the right to terminate a franchise relationship with Shelton Brothers, not the other way around. (*Id*. at #187–88). Cavalier further claims that it bought some products in late 2020, more recently, but still roughly a year before it brought suit. (*See* Doc. 23-3). The Court held an evidentiary hearing on April 25, 2022. (*See* 4/25/22 Minute Entry). The matter is now fully briefed and before the Court.

## LEGAL STANDARD

"The party seeking the preliminary injunction bears the burden of justifying such relief." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012). And that is a heavy burden. As the Sixth Circuit has observed more than once, "preliminary injunctions

are 'extraordinary and drastic remed[ies] … never awarded as of right.'" *Platt v. Bd. of Comm'rs on Grievances and Discipline of Ohio Supreme Ct.*, 769 F.3d 447, 453 (6th Cir. 2014) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)); *Am. Civ. Liberties Union Fund of Mich. v. Livingston County*, 796 F.3d 636, 642 (6th Cir. 2015) (same). Rather, such relief "should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *see also Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (noting that a "preliminary injunction is an 'extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it'") (cleaned up). In other words, the Court "should not … grant[ such relief] unless the movant, *by a clear showing*, carries the burden of persuasion." *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

The Court considers four factors in deciding whether to issue a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 763 (6th Cir. 2019). No one factor is determinative, but rather, the Court should "balance[] [the factors] against each

other." *Overstreet*, 305 F.3d at 573 (citing *United Food & Com. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir. 1998)).

The Court must also remain mindful that "the purpose of a preliminary injunction is to preserve the status quo until a trial on the merits." *S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 848 (6th Cir. 2017) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)); *Doster v. Kendall*, 54 F.4th 398, 441 (6th Cir. 2022) ("As a matter of historical practice, preliminary injunctions have typically sought merely to preserve the 'status quo' by stopping a defendant's threatened conduct from causing (irreparable) harm until the court has a meaningful chance to resolve the case on the merits."). Finally, the Court cannot issue an injunction against a party over whom it lacks personal jurisdiction. *See, e.g.*, *Easterling v. Rice*, No. 2:19-469, 2019 WL 1338712, at *1 (S.D. Ohio Mar. 25, 2019) (citing cases).

## ANALYSIS

The above framework applies differently to the three defendants here. Start with the easier question. Based on the facts known to date, the Court lacks personal jurisdiction over the Breweries and thus declines to enter an injunction against either of them.

That leaves the harder question—Lime. On that front, given the balance of the four factors, Cavalier has not met its heavy burden, largely because it has failed to show a substantial likelihood of success on the merits. By and large, the case comes down to interpreting Ohio's alcoholic beverage franchise act against a somewhat

6

unique factual backdrop. To date, Cavalier has not shown it is entitled to relief under that statute on the facts here, and there are at least some reasons to believe Cavalier may never be able to do so.

The remaining three prongs offer a bit of a mixed bag. As for irreparable injury, the loss of a brand and the accompanying goodwill meets the test. This factor cuts in Cavalier's favor. But the third factor requires the Court to balance that harm against the potential third-party harm if the Court grants the injunction. And here, the requested injunctive relief would harm Sixth City, Ohio beer retailers, and Ohio consumers. Finally, the fourth factor requires the Court to consider the public interest, which also cuts against issuing the injunction. The overall balance shows that preliminary injunctive relief is not warranted.

## A. This Court Presently Lacks Personal Jurisdiction Over The Breweries, And Therefore Lacks The Power To Enter A Preliminary Injunction Against Them.

Federal Rule of Civil Procedure 4 requires service of process before a defendant is subject to a court's jurisdiction. So far as the Court can tell, Cavalier has not yet perfected service of process on the Breweries. And on the present record, it is doubtful whether the Breweries have sufficient contacts with Ohio to establish personal jurisdiction. *See Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (requiring "minimum contacts" with forum state). Neither of the Breweries has waived its defense of lack of personal jurisdiction, and 3F asserted it. (*See* 3F Resp. in Opp'n to Mot., Doc. 15, #104–05). For its part, Cavalier does not address personal jurisdiction or service of process in the instant

Motion, nor did it present evidence at the hearing. Because the Court appears to lack personal jurisdiction over the Breweries, the Court **DENIES** Cavalier's Motion (Doc. 5) for a preliminary injunction against them.[2]

### B. Cavalier Is Not Entitled To A Preliminary Injunction Against Lime.

Lime presents a closer call. At the end of the day, though, given Cavalier's burden of making a "clear showing," *Enchant Christmas*, 958 F.3d at 539, a preliminary injunction is not appropriate under the four-factor test.

### 1. Cavalier Has Failed To Make A Clear Showing That It Is Likely To Succeed On The Merits.

The Court must first consider whether Cavalier has "a strong likelihood of success on the merits," an inquiry that is "often the determinative factor." *Foresight Coal Sales, LLC v. Chandler*, No. 21-6069, 2023 WL 1505226, *2 (6th Cir. Feb. 3, 2023); *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) ("[A] finding that there is simply no likelihood of success on the merits is usually fatal.").

At this point, the legal dispute largely comes down to whether, under Ohio's alcoholic beverage franchise law, Shelton Brothers was "*a* manufacturer" or "*the* manufacturer." To illustrate, if Cavalier had a franchise relationship *only* with Shelton Brothers (i.e., Shelton Brothers was the sole "manufacturer"), then Shelton

---

[2] Granted, it is possible Shelton Brothers was, and Lime now is, an agent for the Breweries. If that is indeed the case, those agent contacts with Ohio could potentially provide a basis for jurisdiction over the Breweries. *Red Square, LLC v. HDAV Outdoor, LLC*, No. 2:14-cv-2064, 2015 WL 5162523, at *3 (S.D. Ohio Sept. 3, 2015) ("An agent's contacts with a forum may be imputed to the principal for purposes of establishing personal jurisdiction.") (citations and quotations omitted). As of yet, though, Cavalier has not established that an agency relationship exists, nor has it argued for personal jurisdiction over the Breweries on this theory.

Brothers' bankruptcy, not Lime, terminated the relationship with Cavalier. That would seemingly torpedo Cavalier's position. But if the Breweries were also separately "manufacturers" under the statute, and thus also had a franchise relationship with Cavalier, then Lime's conduct could be construed as terminating that existing franchise relationship between the Breweries and Cavalier. Under that reading, Cavalier has a better shot at relief.

Unfortunately, the statutory language is vague, and the case law is not much help. That said, the answer appears to turn, at least to some extent, on the nature of the relationship between Shelton Brothers and the Breweries. And on that topic, the Court lacks sufficient information on the record to arrive at a conclusion. As Cavalier bears the burden on its request for a preliminary injunction, this informational shortfall creates an impediment for Cavalier.

Start with the relevant statute—the Ohio Alcoholic Beverage Franchise Act. Under that statute, a "franchise" is any "contract or any other legal device used to establish a contractual relationship between a manufacturer and a distributor." Ohio Rev. Code § 1333.82. A "manufacturer," moreover, is "a person … that manufactures *or* supplies alcoholic beverages to distributors in this state." *Id.* (emphasis added). Importantly, that definition does not limit the term "manufacturer" to those entities that actually brew the "alcoholic beverages" (here beer). Rather, "manufacturer" can also refer to those who supply such beverages to distributors. And a "distributor" is "a person that sells or distributes alcoholic beverages to retail permit holders." *Id.*

The first sentence of § 1333.83 requires the "manufacturer" to enter (or at least offer) a written franchise agreement with "its distributor," identifying the specified "brands or products" covered. Even without that agreement, though, a franchise relationship can arise another way. In particular, "[w]hen a distributor of beer … for a manufacturer … distributes the beer … for ninety days or more without a written contract, a franchise relationship is established." *Id*. But that franchise relationship is "between *the parties*," which means the "manufacturer" and "its distributor" identified in the first sentence. *Id*.

Once a franchise relationship arises, the manufacturer in that relationship cannot confer another franchise upon any other distributor "for the sale of the same brand within the same sales area or territory." Ohio Rev. Code § 1333.84(B). In other words, a franchise confers upon a distributor the exclusive right to sell the "specified brands or products of the manufacturer" within a given turf. Ohio Rev. Code § 1333.83. Moreover, a manufacturer may not "withhold delivery of alcoholic beverages ordered by a distributor, or change or amend a distributor's quota of a manufacturer's product or brand" except for "reasonable cause." Ohio Rev. Code § 1333.84(D). In turn, "no manufacturer or distributor shall cancel or fail to renew a franchise … without the prior consent of the other party for other than just cause and without at least sixty days' written notice," unless a specific statutory exception applies. *See* Ohio Rev. Code § 1333.85.

So how does that play out here? There are some easy issues—no one disputes that Cavalier is a "distributor" under the statute. And Cavalier apparently had a

10

contract with Shelton Brothers to sell the Breweries' products. Cavalier sold those products for more than ninety days, thus creating a franchise relationship (with whom is a matter the Court discusses below), even if no written agreement existed.[3] No one disputes that Lime now refuses to supply the Breweries' products to Cavalier. And no one disputes that, by supplying alcoholic beverages (including the Breweries' products), Shelton Brothers was, and Lime is, "a manufacturer" of those products for purposes of § 1338.85. Finally, no one contends that Lime had just cause or gave sixty days' notice before declining to supply the Breweries' products to Cavalier. But that leaves an important question. Was Cavalier a distributor *for* the Breweries under § 1333.83? In other words, did Cavalier have a protected relationship *with the Breweries themselves*, or was its protected relationship solely with Shelton Brothers?

The case law is sparse on this question, and the guidance it offers is mixed at best. The closest case is *Heineken U.S.A., Inc. v. Esber Beverage Co.,* 10 N.E.3d 1164, 1167 (Ohio Ct. App. 2014), *vacated on other grounds*, No. 2013 CA 00158, 2014 WL 1831244 (Ohio Ct. App. Mar. 10, 2014). There, the court seemed to assume that a distributor's sale of foreign-manufactured products could give rise to a protected interest in selling the brand, even if the distributor purchased the brand from an importer. *See id.* at 1167–68. But the court also suggested, in tension with that assumption, that the "[t]he franchise agreement was between [the importer] as 'supplier' and … [the] 'distributor,'" rather than between the distributor and the actual producer of the alcoholic beverage. *Id.* at 1168.

---

[3] The record does not indicate whether the relevant agreement was written or oral.

The statutory language also does not lead to one clear answer. As noted above, the statute defines a "distributor" as "a person that sells or distributes alcoholic beverages to retail permit holders in this state." Ohio Rev. Code § 1333.82. That seems to place the focus on *the beverages* the distributor sells to determine the scope of the franchise. In the same vein, § 1333.83's language places the focus on the distributor's act of selling beer or wine, rather than the nature of the manufacturer's involvement in that activity. And of course, in common parlance, a brewer manufactures the beer a distributor eventually receives, regardless of the intermediate steps the beer took to reach the distributor. In other words, the brewing company potentially could be considered a "manufacturer" vis-à-vis that distributor—even in the absence of any direct relationship.

Other parts of the statutory language, though, arguably point in a different direction. Section 1333.83 requires the "manufacturer" to have (or at least offer) to "its" distributors a "written franchise" agreement for the sale of "the manufacturer['s]" products. And if the manufacturer fails to do so and the distributor nonetheless sells products, then a franchise arises "between the parties," i.e., a reference to "the manufacturer" and "its distributor." Ohio Rev. Code § 1333.83. That suggests that (1) the provision contemplates a single manufacturer for the "specified brands or products" ("the" manufacturer), who (2) is the entity that transfers the product to "its distributor" or, at the very least, controls distribution of the brand to that distributor.

12

On that last point, interpreting the statute to define the manufacturer in terms of who controls the distribution decision makes some sense. After all, the purpose of Ohio's franchise law is to ensure that those who control distribution of a given brand don't decide to shift their business from one distributor to another, thereby taking unfair advantage of the goodwill that the original distribution relationship created. In other words, the franchise law prevents a certain form of upstream opportunism. As another judge in this District described it:

> [T]he Alcoholic Beverage Franchise Act is designed in part to protect distributors from certain practices of beverage manufacturers. It recognizes that distributors often have a substantial investment in their businesses, including the physical assets and real property used to distribute the manufacturers' products, and that to allow a manufacturer unilaterally to terminate a franchise agreement puts the franchise distributors at great risk of harm. The just cause requirement for terminating a franchise agreement is intended to protect the franchisee from this type of arbitrary and potentially coercive act.

*Beverage Distributors, Inc. v. Miller Brewing Co.*, No. 2:08-cv-1112, 2009 WL 1542730, at *5 (S.D. Ohio June 2, 2009). On that account, the act protects the franchisee from the entity that has the power to "unilaterally … terminate a franchise," and thus could otherwise can act opportunistically.

Adding further weight to this interpretation, Cavalier itself seems to concede that brand control matters. It claims in the Motion that it has a strong likelihood of success precisely "because Brouwerij 3 Founteinen and De La Senne have never changed hands and continue to enjoy ownership and control over their own brands." (Doc. 5, #60). And it doubles down on the importance of control in its Reply, noting that "[t]o be sure, whether an entity is a 'manufacturer' under the [Ohio Alcoholic

Beverage Franchise Act] is about the *level of control* that entity has *over the actual brands* being sold." (Doc. 23, #183 (emphasis in original) (citing cases)).

But if control matters, Cavalier has a problem. The facts suggest Shelton Brothers, not the Breweries, exclusively controlled "the actual brands" in the United States prior to Shelton Brothers' bankruptcy. Indeed, the hearing testimony showed that the industry called these products the "Shelton Brothers portfolio" or the "Shelton Brands." And from the evidence presented so far, it appears that the Breweries themselves exercised no meaningful control over who distributed their beers, leaving that decision entirely to Shelton Brothers (and apparently now to Lime). So if the unilateral ability to control product distribution matters in deciding who is a manufacturer for purposes of Ohio's alcoholic beverage franchise law, then Shelton Brothers (and now Lime), not the Breweries, appears to qualify for that role on the facts here.

To be sure, Cavalier pushes back on that conclusion, focusing on the control the Breweries did exercise. Cavalier notes the Breweries own the trademarks and have the right to terminate Shelton Brothers/Lime if the Breweries do not like who the importer chooses for distribution. But as to the first, it is not clear that owning the trademark, without more, amounts to "controlling" the brand for purposes of Ohio's franchise law. Rather, control of the distribution decision seems the more relevant factor. And as to the latter, even if the Breweries could exercise control that decision, the evidence does not suggest that they have. To the contrary, as noted, it

14

appears that the Breweries left it entirely to Shelton Brothers, and now Lime, to make those choices.

In short, Ohio's Alcoholic Beverage Franchise Act could be understood as creating franchise obligations only against the party or parties that select(s) the Ohio distributors, thereby controlling the flow of product into their hands. Under that interpretation, if a brewer takes part in the selection of an Ohio distributor, the brewer has franchise obligations to that distributor. And in that circumstance, a brewer cannot avoid those obligations by interjecting another party, like an importer, into the shipping process. But where, as here, the brewer relinquishes its say over *all* distribution decisions and the importer takes *exclusive* control over those decisions, the brewer would not incur franchise obligations under Ohio law. That is not to say that further legal and factual development may not change that conclusion either about the statute's meaning, or the degree of control that the Breweries exercised here. But for current purposes, given that Ohio's Alcoholic Beverage Franchise Act at least could be understood this way, Cavalier has not shown that it has a substantial likelihood of success on the merits.[4]

---

[4] There is another avenue by which Cavalier could perhaps succeed. Upon further factual development, Cavalier may be able to show that Shelton Brothers acted as the Breweries' actual or apparent agent. Perhaps, then, Shelton Brothers had actual or apparent authority to act on behalf of, and so bind, the Breweries themselves. If that were the case, the Breweries presumably would have contractual or franchise obligations to Cavalier enforceable under Ohio's Alcoholic Beverage Franchise Act. Moreover, as noted above, such a relationship (if it exists) also potentially could give this Court personal jurisdiction over the Breweries. In ruling on Cavalier's Motion, though, the Court cannot simply assume such an agency relationship existed. Rather, the party bearing the burden—here Cavalier—must prove it.

A similar problem prevents Cavalier from establishing a strong likelihood of success on its tortious interference with business relationship claim. In particular, under Ohio law, "[t]he elements of tortious interference with a business relationship are: (1) a business relationship; (2) the tortfeasor's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Emanuel's LLC v. Restore Marietta, Inc.*, No. 22CA6, 2023 WL 311525, at *6 (Ohio Ct. App. Jan. 17, 2023). As things stand, the Court is concerned about both Elements 1 and 3. As to the former, it is not clear Cavalier had a "business relationship" with the Breweries (as opposed to with Shelton Brothers). As to the latter, it is not clear that Lime, as opposed to the Shelton Brothers' bankruptcy, is what "caused the breach or termination" of any relationship between Cavalier and the Breweries.

True, it may be that further development and argument—either as to the law or the facts—could change this conclusion. But on the record for the instant motion, Cavalier has not met its burden of establishing a likelihood of success.

### 2. Cavalier May Suffer Irreparable Harm Absent Injunctive Relief.

The second prong of the preliminary injunction test requires the Court to consider whether irreparable harm will result absent an injunction. *Speech First*, 939 F.3d at 763. On that score, the Court acknowledges that irreparable harm can result where a distributor loses the ability to distribute beers that previously comprised part of its portfolio. *See Southern Glazer's Distributors of Ohio*, 860 F.3d at 853 ("When a distributor loses a unique product … it threatens their relationship with the retailers

16

that have come to rely on the distributor for the in-demand product …. This loss of customer goodwill is a prime example of intangible, irreparable harm."); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) ("The loss of customer good will often amounts to irreparable injury because the damages flowing from such losses are difficult to calculate."). That is true even if the brands at issue constitute a small portion of the portfolio. *See Hill Distributing Co. v. St. Killian Importing Co., Inc.*, No. 2:11-cv-706, 2011 WL 3957255, at *4–5 (S.D. Ohio Sept. 7, 2011) (finding irreparable harm even though brands comprised only 0.51% of distributor's portfolio).

At the hearing, the Court heard testimony the Breweries' beers occupy a special—if small—position in the market and that some customers seek out the Breweries' products in particular. *Cf. Dayton Heidelberg Distrib. Co. v. Vineyard Brands, Inc.*, 108 F. Supp. 2d 859, 865 n.4 (S.D. Ohio 2000) (finding no irreparable harm where "the Plaintiffs had other wines in their portfolios which could replace those of the Defendant"); *Excello Wine Co. v. Monsieur Henri Wines, Ltd.*, 474 F. Supp. 203, 210 (S.D. Ohio 1979) (holding plaintiff would not necessarily suffer irreparable harm in part because customers would not seek wine based on supplier). This establishes that Cavalier may suffer some irreparable harm absent a preliminary injunction. This prong, then, cuts in Cavalier's favor.

### 3. The Balance Of Harms Weighs Against Injunctive Relief.

The third prong requires the Court to consider the balance of third-party harms. *Speech First,* 939 F.3d at 763. As is often the case, an injunction that averts irreparable harm to Cavalier will necessarily cause some harm to others. Therefore,

the Court must balance those potential harms. *See Nexus Gas Transmission, LLC v. City of Green*, 757 F. App'x 489, 495 (6th Cir. 2018) ("The next factor requires us to "balance the harm that [Nexus] would face [absent an injunction] against that which [Landowners] would face if we uphold the injunction.").

Here there are multiple potential harms to third parties. Clearly, Sixth City will suffer its own irreparable harm should the injunction issue. Indeed, its injury in many ways mirrors the harm Cavalier claims it faces without the injunction. And, given that Cavalier has not established a strong likelihood of success on the merits, the Court fears there is a substantial risk Sixth City may end up *wrongly* suffering that irreparable harm while this matter is pending.

Beyond that, issuing the injunction will have other impacts too. At the hearing, Cavalier clarified that its requested injunction would not require Lime to sell the products to Cavalier. Rather, the requested order would preclude Lime from selling the Breweries' products *to anyone* other than Cavalier. Accordingly, entering the relief Cavalier requests may deprive Ohio retail beer sellers of these products, in turn leaving a sour taste (or the absence of one) in the mouths of Ohio's lambic beer lovers during the pendency of this litigation. Therefore, the Court finds the potential harm to third parties cuts against issuing the injunction.

### 4. Issuance Of A Preliminary Injunction Is Not In The Public Interest.

That leaves the fourth prong—the public interest. *Id*. The Ohio General Assembly established a scheme protecting franchise relationships between manufacturers and distributors of alcoholic beverages and granting certain rights

and protections to distributors. In so doing, the General Assembly recognized distributors have reliance interests in the continued supply of beer and determined that protecting those interests promotes the public safety, health, and welfare. That said, the public's interest lies in seeing this law *appropriately* enforced. As discussed, the Court is not convinced, on the current record, that Cavalier will prevail on its franchise act challenge, meaning Cavalier has not shown that the public interest favors a preliminary injunction. And the Ohio beer-consuming public's interest favors the continued availability of these products, whether delivered though Cavalier or through Sixth City. So the fourth factor too weighs against granting a preliminary injunction.

## CONCLUSION

Cavalier has failed to make the "clear showing" that the "extraordinary and drastic remedy" of a preliminary injunction is warranted here. *Enchant Christmas*, 958 F.3d at 539. Thus, the Court **DENIES** Cavalier's Motion (Doc. 5).

**SO ORDERED.**

March 7, 2023
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

19